## IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF VIRGINIA

### Alexandria Division

| | | |
|---|---|---|
| Wayne Alphonso Thomas, Jr., | ) | |
|     Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:21cv1428 (AJT/JFA) |
| | ) | |
| Thomas Meyer, *et al.*, | ) | |
|     Defendants. | ) | |

### <u>MEMORANDUM OPINION</u>

Plaintiff Wayne Alphonso Thomas, Jr., a Virginia inmate proceeding *pro se*, brought this action pursuant to 42 U.S.C. § 1983 to redress alleged violations of Plaintiff's rights during his incarceration at the State Farm Enterprise Unit ("SFEU"), a unit of the Virginia Department of Corrections ("VDOC"). [Compl., Dkt. No. 1; Mem. Supp. Compl., Dkt. No. 2]. Defendants have moved for summary judgment on the ground that Plaintiff failed to exhaust his available administrative remedies. [Mot. Summ. J., Dkt. No. 30; Mem. Supp. Mot. Summ. J., Dkt. No. 31]. Plaintiff has moved to strike Defendants' Motion for Summary Judgment, under Federal Rule of Civil Procedure 12(f). [Mot. Strike, Dkt. No. 37; Mem. Supp. Mot. Strike, Dkt. No. 38].

For the reasons that follow, Plaintiff's Motion to Strike [Dkt. No. 37] will be denied, and Defendants' Motion for Summary Judgment [Dkt. No. 30] will be denied without prejudice.

### I.  <u>Relevant Procedural History</u>

Plaintiff's Complaint asserts § 1983 claims against four Defendants, all of whom worked at SFEU at all relevant times: (1) Thomas Meyer, Warden; (2) Ross Maurice, Assistant Warden; (3) Dichell Williams, Major of Security; and (4) Desiree Watford, Unit Manager.

[Compl. at 1–2, 4].[1] In sum, Plaintiff alleges that Defendants acted with deliberate indifference, in violation of Plaintiff's Eighth Amendment rights, by failing to protect him from the COVID-19 virus, which caused him to contract COVID-19. [Mem. Supp. Compl. at 1–8]. Defendants timely answered the Complaint. [Answer, Dkt. No. 19]. Plaintiff filed a sworn "Reply Brief" in response to Defendants' Answer. [Reply Br., Dkt. No. 28].

Defendants then moved for summary judgment, arguing that Plaintiff failed to properly exhaust available administrative remedies pursuant to 42 U.S.C. § 1997e(a). [Mot. Summ. J. at 1; Mem. Supp. Mot. Summ. J. at 1–2, 7–10]. Plaintiff filed a response in opposition to Defendants' Motion for Summary Judgment. [Resp. Mot. Summ. J., Dkt. No. 39]. Plaintiff simultaneously moved to strike the Motion for Summary Judgment under Rule 12(f). [Mot. Strike at 1; Mem. Supp. Mot. Strike at 1].

The Court has reviewed and considered Plaintiff's Complaint;[2] Defendants' Motion for Summary Judgment and Plaintiff's response thereto; Plaintiff's Motion to Strike; the parties' other submissions; and all of the affidavits, documents, and exhibits attached to each of those filings. *See generally* Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials, but it may consider other materials in the record."). All pending motions are ripe for adjudication.

## II.  Factual Background

### A.)  Plaintiff's 42 U.S.C. § 1983 Claims

Plaintiff alleges that SFEU was placed on lockdown on May 25, 2020, "due to suspected contagion" resulting from the COVID-19 virus. [Mem. Supp. Compl. ¶ 4]. On May 26, 2020, all

---

[1] The Court employs the pagination assigned by the CM/ECF docketing system for citations to the parties' submissions.

[2] The Court treats the Complaint, together with the memorandum attached thereto, as a verified pleading entitled to evidentiary weight at summary judgment. *See* [Mem. Supp. Compl. at 8]; 28 U.S.C. § 1746; *Goodman v. Diggs*, 986 F.3d 493, 495 n.2, 498 (4th Cir. 2021).

SFEU inmates were tested for COVID-19, but all inmates who worked were required to return to their positions the following day, before receiving any test results. [*Id.* ¶¶ 4–5]. Defendants Williams and Watford, with the authorization of Defendants Meyer and Maurice, allegedly made the decision to return the inmates to work. [*Id.* ¶ 5]. On May 27 and May 28, 2020, Plaintiff was required to report to his work position in the Silk Screen Shop and "attend scheduled meals in the dining hall where there was substantial interaction with . . . kitchen workers." [*Id.* ¶ 6].

The COVID-19 test results arrived on May 29, 2020, and "numerous" officers, staff, and kitchen workers tested positive. [*Id.* ¶ 7]. One of SFEU's two housing units (the C-4 unit) had two of its floors placed on lockdown, but Defendants Watford, Williams, and Maurice opted not to lock down the other unit (the C-3 unit), where Plaintiff was housed. [*Id.* ¶¶ 4, 7]. Plaintiff was required to continue reporting to work and, on May 30, 2020, he "came into contact repeatedly" with his shop supervisor, who was later discovered to have the COVID-19 virus. [*Id.* ¶ 8]. All four Defendants allegedly knew this but "still insisted" that Plaintiff and the other shop employees continue to work. [*Id.*]. More generally, Plaintiff claims that all four Defendants "either directly decided, or authorized that decision to allow large groups of offenders to congregate" throughout the COVID-19 pandemic. [*Id.* ¶ 9].

On June 15, 2020, an offender named Alonzo Howell fainted at work and was sent to a hospital with COVID-19 complications. [*Id.* ¶ 11; Howell Aff., Dkt. No. 2-4]. Defendants Watford, Williams, and Maurice then imposed a lockdown for all of SFEU and "required the entire population to be tested." [Mem. Supp. Compl. ¶ 11]. According to Plaintiff, approximately two-thirds of offenders in the C-3 unit tested positive for the COVID-19 virus, but Plaintiff's test, taken on June 17, was negative. [*Id.*; *see* Test Results at 1, Dkt. No. 2-5].

Defendants Watford and Williams, "with the approval of [Defendants] Maurice and Meyer," allegedly "decided to relocate offenders . . . who had tested positive in exchange for those offenders who had tested negative." [Mem. Supp. Compl. ¶¶ 12, 25]. Plaintiff was then "moved to a cell that had immediately been occupied by an offender who tested positive." [*Id.* ¶ 25]. Plaintiff alleges that all four Defendants lifted the lockdown of the C-3 unit on June 30, 2020, "without conducting any testing to determine whether the virus had spread to the previously uninfected offenders." [*Id.* ¶¶ 13, 26].

Plaintiff began experiencing COVID-19 symptoms on July 5, 2020, and notified the Medical Department. [*Id.* ¶ 14]. Plaintiff was tested for the COVID-19 virus on July 8, 2020, and a positive test result was returned on July 11, 2020. [*Id.*; *see* Test Results at 1, Dkt. No. 2-6]. Plaintiff avers that he first learned of this positive test result on July 13, 2020. [Thomas Aff. at 2, Dkt. No. 39-4].[3] On July 20, 2020, Plaintiff tested positive for the COVID-19 virus a second time. [Mem. Supp. Compl. ¶ 14; *see* Test Results at 3, Dkt. No. 2-6]. From contracting COVID-19, Plaintiff allegedly suffered "severe respiratory distress, fever, chest pain, palpations, hair loss, loss of taste and smell, joint and body aches and other symptoms," as well as long-lasting respiratory damage, mental duress, and "a medical condition that places [him] at high risk to develop clots within [his] blood, tissue and vital organs." [Mem. Supp. Compl. ¶¶ 28–29]. For these injuries, Plaintiff seeks damages of $100,000.00. [*Id.* at 8; Compl. at 5].

**B.) The VDOC Grievance Procedure**

VDOC Operating Procedure 866.1 (the "Grievance Procedure") "is a mechanism for inmates to resolve complaints, appeal administrative decisions and challenge the substance of procedures." [Johnson Aff. ¶ 4; *see* Operating Procedure 866.1, Dkt. No. 31-1 at 9–22]. "All issues

---

[3] Plaintiff executed and filed two versions of this affidavit. [*See* Dkt. Nos. 36, 39-4]. As the two versions are identical in substance, the Court will cite only to the later version [Dkt. No. 39-4].

are grievable except those pertaining to policies, procedures and decisions of the Virginia Parole Board, disciplinary hearings, State and Federal court decisions, laws and regulations, and matters beyond the control of the [VDOC]." [Johnson Aff. ¶ 5]. "Each facility shall notify each offender upon arrival and during orientation how to access the Offender Grievance Procedure including sources of Informal Complaint, Emergency Grievance, and Regular Grievance forms and directions for submitting each document." [Operating Procedure 866.1.IV.A.4].

The Grievance Procedure requires offenders "to resolve their issues informally with facility staff prior to submitting a formal grievance." [Operating Procedure 866.1.V.A]. "The offender should demonstrate . . . a good faith effort to resolve their issue informally," which "shall be documented using an Informal Complaint [form], except where operating procedures specifically state that other documentation may be used for the informal process." [Operating Procedure 866.1.V.A.1–2]. Responses to Informal Complaints are "made in writing on the Informal Complaint form with reasons for the response stated clearly. The Informal Complaint response should be returned to the office that logged it and the response forwarded to the offender." [Operating Procedure 866.1.V.D].

With limited exceptions, a Regular Grievance must "be submitted within 30 calendar days from the date of [the] occurrence/incident or discovery of the occurrence/incident." [Operating Procedure 866.1.VI.A.1].[4] Thus, "[p]rison staff should respond to the offender's informal complaint within 15 calendar days to ensure that the informal response is provided" before the thirty-day period to file a Regular Grievance expires. [Johnson Aff. ¶ 6].

___

[4] Exceptions to this thirty-day limit include instances "[b]eyond the offender's control" or "[w]here a more restrictive time frame has been established in operating procedures." Operating Procedure 866.1.VI.A.1.a–b. Also, "[t]here is no time limit on when an offender may submit a grievance regarding an allegation of sexual abuse." [Operating Procedure 866.1.VI.A.1.c].

Prison officials conduct an "Intake" review to ensure that a submitted Regular Grievance meets the criteria for acceptance. [Operating Procedure 866.1.VI.B.3–4]. If a Regular Grievance fails to meet the criteria for acceptance, prison officials complete the "Intake" section of the Regular Grievance form and return the Grievance to the offender "within two working days from date received." [Operating Procedure 866.1.VI.B.4]. "If an offender wishes a review of the intake decision on any grievance, they may send the Regular Grievance form within five calendar days of receipt to the appropriate Regional Ombudsman for a determination . . . . There is no further review or appeal of intake decisions." [Operating Procedure 866.1.VI.B.5].

Regular Grievances that pass the intake process have "three possible levels of review." [Operating Procedure 866.1.VI.C]. First, "Level I reviews are conducted by the Warden or Superintendent of the prison." [Johnson Aff. ¶ 8]. "If the inmate is dissatisfied with the determination, he may appeal the determination to Level II. Level II responses are provided by the Regional Administrator, Health Services Director, Chief of Operations for Offender Management Services or Superintendent for Education." [*Id.*]. "For most issues, Level II is the final level of review. For those issues appealable to Level III, the Deputy Director or Director of the VDOC conducts a review of the regular grievance." [*Id.*].

An offender may file an Emergency Grievance to report "situations or conditions which may subject the offender to immediate risk of serious personal injury or irreparable harm." [Operating Procedure 866.1.VII.A]. However, the "[s]ubmission of an Emergency Grievance does not satisfy the exhaustion of remedies requirement; the offender must submit the issue on a Regular Grievance if not satisfied with the Emergency Grievance response." [Operating Procedure 866.1.IV.O.2.a].

"The exhaustion-of-remedies doctrine requires that procedures established by the [VDOC] must be initiated and followed before an aggrieved party may seek relief from the Courts. After all other available remedies have been exhausted, a lawsuit may be filed." [Operating Procedure 866.1.IV.O.1]. "If a Regular Grievance does not meet the criteria for acceptance and review by the Regional Ombudsman does not result in intake into the grievance process, the issue must be resubmitted in accordance with the criteria for acceptance." [Operating Procedure 866.1.IV.O.2.b]. "The exhaustion of remedies requirement will be met only when the Regular Grievance has been accepted into the grievance process and appealed through the highest eligible level without satisfactory resolution of the issue." [*Id.*].

### C.) Plaintiff's Grievance Submissions

#### 1.) Emergency Grievances

On July 5, 2020, Plaintiff submitted an Emergency Grievance seeking medical attention for "coronavirus symptoms" that included headaches, body aches, lack of taste and smell, difficulty breathing, and weakness. [Emergency Grievance 405191, Dkt. No. 39-1]. SFEU staff sent a response the following day, indicating that this grievance did not "meet the definition for an emergency" and explaining that Plaintiff could "be seen in medical." [*Id.*].

On July 7, 2020, at 2:33 p.m., Plaintiff submitted another Emergency Grievance describing COVID-19 symptoms including fatigue, constant headaches, body aches, fever, dizziness, and lack of smell and taste. [Emergency Grievance 1298155, Dkt. No. 31-1 at 23]. Plaintiff stated that he had filed an Emergency Grievance two days prior but still had not received any medical attention. [*Id.*]. SFEU staff responded later on July 7, 2020, indicating again that Plaintiff's grievance did not "meet the definition for an emergency" but noting that Plaintiff was "[e]valuated by Medical" at 3:38 p.m. on that date. [*Id.*].

### 2.) Informal Complaint PRCC-20-INF-00756 and Rejected Regular Grievance

On August 3, 2020, Plaintiff submitted an Informal Complaint that stated as follows:

I'm forwarding this Informal Complaint due to the NEGLIGENCE of (S.F.E.U.) Administration causing me to be exposed to & catching "COVID-19." On (6-19-20) out of 120 offenders in my housing unit, 80 tested positive for "COVID-19." I'd tested $^{(-)}$negative, and was moved out of my cell (A34); and placed in (C21) on C-Tier into the cells of those who tested $^{(+)}$positive, and was quarantined. On (7-1-20) without "RETESTING," my unit was open; and I contracted COVID-19.

[Informal Complaint PRCC-20-INF-00756, Dkt. No. 31-1 at 29]. Defendant Maurice responded to the Informal Complaint on August 5, 2020, and maintained that SFEU officials had "followed all CDC and VDH guidelines to reduce the risk of exposure to offenders," such as "the cohorting of offenders, enhanced sanitation practices, mandatory mask wearing and social distancing." [*Id.*]. Defendant Maurice stated further that SFEU had no known active COVID-19 cases at that time, but that if Plaintiff felt symptomatic, he should alert staff accordingly. [*Id.*].

On August 6, 2020, Plaintiff tried to file a Regular Grievance raising the same facts. [*See* Aug. 6, 2020 Grievance, Dkt. No. 31-1 at 24]. In his Regular Grievance, Plaintiff repeated verbatim the description of events that he had stated in Informal Complaint PRCC-20-INF-00756. [*Id.*]. Notably, Plaintiff's Regular Grievance mentioned the same two relevant dates, and only those dates: June 19, 2020, and July 1, 2020. [*Id.*]. In a section of the Regular Grievance form labeled "Date/Time of Incident," Plaintiff wrote, "July 1, 2020." [*Id.*].

The former Grievance Coordinator for SFEU, R. Langford, conducted the intake review for Plaintiff's Regular Grievance and found that it failed to meet the Grievance Procedure's criteria for acceptance. [Johnson Aff. ¶ 16]. In the "Intake" section of Plaintiff's Regular Grievance, Langford marked a box indicating that Plaintiff's complaint was "Non-Grievable" and, on the same line, she marked a different box labeled "Matters beyond the control of the Department of

Corrections." [Aug. 6, 2020 Grievance, Dkt. No. 31-1 at 25]. Langford also marked a box labeled "Expired Filing Period" and made a handwritten notation that said, "occur 7/1." [*Id.*]. Langford's mark in the "Non-Grievable" box has an extra line through it, which the current Grievance Coordinator, A. Johnson, interprets as Langford's effort to "mark[] out that reason." [*See id.*; Johnson Aff. ¶ 16]. Langford's marks in the "Matters beyond the control of the Department of Corrections" and "Expired Filing Period" boxes do not contain this extra line. [*See* Aug. 6, 2020 Grievance, Dkt. No. 31-1 at 25].

Plaintiff appealed the intake decision to the Regional Ombudsman[5] in a letter that is dated August 9, 2020, and stamped as received on August 13, 2020. [*See* Aug. 9, 2020 Letter, Dkt. No. 39-3 at 3].[6] The body of Plaintiff's letter stated, in its entirety:

> I'd tested <sup>(−)</sup>negative on (6-19-20), where I was moved from (C3 A34) to (C3 C21) and was quarantined there until ⋆(7-1-20); the day which this institution was "reopen without testing" after such a severe outbreak. ⋆(I did not receive my "COVID-19" test results until:<7-13-20>, were I was placed in Powhatan Medical Unit for [14] days, and was (retested) twice before being released.) Also this matter is neither beyond the control of "State Farm Enterprise Unit/D.O.C." due to the fact that this administration showed (Negligence) by KNOWING that I'd already tested (−Negative) before them reopening my housing unit, and failing to retest; thereby exposing me to "catching the CORONOVIRUS."

[*Id.* (emphasis, spelling, and punctuation unchanged from original)]. The Regional Ombudsman upheld Langford's intake decision, apparently without explanation. [Aug. 6, 2020 Grievance, Dkt. No. 31-1 at 25].

---

[5] Plaintiff confuses the issue by claiming that he filed this appeal with "the Level II responder." [Resp. at 5; Thomas Aff. at 2]. That is not what happened. An appeal to the Regional Ombudsman when a grievance is *rejected* for intake is an entirely different procedure from seeking a Level II review, which is available only if a grievance is *accepted* for intake. When a grievance is rejected for intake—as Plaintiff's was—it cannot proceed to Level I review, let alone Level II review.

[6] Curiously, Defendants' summary-judgment filings suggest that Plaintiff's VDOC grievance file does not contain this document. [*See* Mem. Supp. Mot. Summ. J. at 5; Johnson Aff. ¶ 20].

Plaintiff's VDOC grievance file "does not contain any other grievances wherein he complains about having contracted Covid-19." [Johnson Aff. ¶ 22]. Plaintiff does not dispute that the grievance documents described above are the only ones relevant to his claims in this action.

### III.  Plaintiff's Motion to Strike

As a preliminary matter, Plaintiff moves for Defendants' Motion for Summary Judgment to be stricken under Federal Rule of Civil Procedure 12(f). [*See* Mot. Strike at 1; Mem. Supp. Mot. Strike at 1]. Rule 12(f) authorizes a court to "strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). However, a motion for summary judgment is not a "pleading." *See* Fed. R. Civ. P. 7(a) (listing types of pleadings). As a result, Rule 12(f) does not apply.

Outside the scope of Rule 12(f), a district court has inherent power, in appropriate circumstances, "to strike items from the docket as a sanction for litigation conduct." *Ready Transp., Inc. v. AAR Mfg., Inc.*, 627 F.3d 402, 404 (9th Cir. 2010); *see also Iota Xi Chapter of Sigma Chi Fraternity v. Patterson*, 566 F.3d 138, 150 (4th Cir. 2009) (upholding, as "an appropriate sanction," an order striking surplus pages of filing that exceeded page limitation). There is no reason to exercise such power here. Plaintiff contends that Defendants' Motion for Summary Judgment was improper because Defendants "ha[d] already submitted their defensive pleading," i.e., their Answer. [Mem. Supp. Mot. Strike at 1]. Plaintiff's argument is frivolous; nothing in the Federal Rules of Civil Procedure prohibits a defendant from filing an answer and later moving for summary judgment. Thus, Plaintiff's Motion to Strike will be denied.

### IV.  Defendants' Motion for Summary Judgment

Summary judgment is appropriate only when the Court, viewing the record as a whole and in the light most favorable to the nonmoving party, finds that "there is no genuine dispute as to

10

any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Tolan v. Cotton*, 572 U.S. 650, 655–57 (2014); *Scott v. Harris*, 550 U.S. 372, 380 (2007). A fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A factual dispute is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The moving party bears the initial burden to demonstrate the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the movant carries this burden, the nonmovant must present specific facts that demonstrate a genuine dispute for trial, not "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials," or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). A verified complaint, whether operative or superseded, serves as "the equivalent of an opposing affidavit for summary judgment purposes, when the allegations contained therein are based on personal knowledge." *Goodman v. Diggs*, 986 F.3d 493, 498 (4th Cir. 2021) (internal quotation marks omitted).

"Although the court must draw all justifiable inferences in favor of the nonmoving party, the nonmoving party must rely on more than conclusory allegations, mere speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence." *Dash v. Mayweather*, 731 F.3d 303, 311 (4th Cir. 2013). Rather, there must be enough evidence to enable

a reasonable factfinder to return a verdict for the nonmoving party. *Anderson*, 477 U.S. at 252. Moreover, "at the summary judgment stage the judge's function is not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. The critical inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52.

Here, Defendants argue that they are entitled to summary judgment because Plaintiff failed to exhaust all available administrative remedies before filing suit, as the Prison Litigation Reform Act ("PLRA") requires. [Mem. Supp. Mot. Summ. J. at 7–10]. In relevant part, the PLRA provides: "No action shall be brought with respect to prison conditions under [42 U.S.C. § 1983] or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). Because the exhaustion of administrative remedies is an affirmative defense, a defendant bears the burden of proving lack of exhaustion. *See Jones v. Bock*, 549 U.S. 199, 212, 216 (2007); *Moore v. Bennette*, 517 F.3d 717, 725 (4th Cir. 2008). Nevertheless, "exhaustion in cases covered by § 1997e(a) is mandatory," and district courts have no discretion to waive this requirement. *Porter v. Nussle*, 534 U.S. 516, 524 (2002).

Furthermore, "the PLRA exhaustion requirement requires *proper* exhaustion." *Woodford v. Ngo*, 548 U.S. 81, 93 (2006) (emphasis added). "[T]o properly exhaust administrative remedies prisoners must 'complete the administrative review process in accordance with the applicable procedural rules.'" *Jones*, 549 U.S. at 218 (quoting *Woodford*, 548 U.S. at 88). Those rules "are defined not by the PLRA, but by the prison grievance process itself," and thus "it is the prison's requirements . . . that define the boundaries of proper exhaustion." *Id.*

Consequently, the VDOC's Grievance Procedure defines the applicable rules for Plaintiff to properly exhaust his § 1983 claims prior to bringing suit. [Operating Procedure 866.1.IV.O.1]. Pursuant to the Grievance Procedure, Plaintiff was required to (i) file a Regular Grievance that was accepted for intake, and then (ii) appeal that Regular Grievance through all eligible levels of review without satisfactory resolution, before raising those claims in court. [Operating Procedure 866.1.IV.O.2.b].

The record leaves no doubt that Plaintiff failed to meet these requirements. First, Plaintiff's Emergency Grievances are irrelevant to the issue of exhaustion, as the Grievance Procedure is explicit that the "[s]ubmission of an Emergency Grievance does not satisfy the exhaustion of remedies requirement." [Operating Procedure 866.1.IV.O.2.a].[7] Second, Plaintiff tried to file only one Regular Grievance regarding his contraction of COVID-19, and that grievance was not accepted for intake. [*See* Aug. 6, 2020 Grievance, Dkt. No. 31-1 at 25]. It follows that Plaintiff did not fully exhaust the administrative remedies that the Grievance Procedure prescribes.

The exhaustion analysis does not end there, however, for Plaintiff argues that the Grievance Procedure was "unavailable" to him. [Resp. Mot. Summ. J. at 6–7]. The PLRA demands exhaustion only of remedies that "are available." 42 U.S.C. § 1997e(a). "An inmate, that is, must exhaust available remedies, but need not exhaust unavailable ones." *Ross v. Blake*, 578 U.S. 632, 642 (2016). Although the PLRA does not define the term "available," "courts have generally afforded it its common meaning; thus, an administrative remedy is not considered to have been available if a prisoner, through no fault of his own, was prevented from availing himself of it." *Moore*, 517 F.3d at 725.

---

[7] Plaintiff cites *Downey v. Pennsylvania Department of Corrections*, 968 F.3d 299 (3d Cir. 2020), for the opposite proposition, that submitting an emergency grievance alone satisfies the PLRA's exhaustion requirement. [Resp. Mot. Summ. J. at 7]. The ruling in *Downey* hinged on Pennsylvania prison grievance procedures that are plainly inapplicable here. *See Downey*, 968 F.3d at 305–07.

Plaintiff contends that the "several reasons denoted on the decisions to deny intake" of his Regular Grievance give rise to a genuine dispute of material fact. [Resp. Mot. Summ. J. at 7]. More specifically, he argues that Langford's mark indicating a matter beyond the control of the VDOC "creates a genuine dispute concerning the material fact of why intake was denied, and why the appeal [to the Regional Ombudsman] was denied." [*Id.* at 4 n.4]. As Defendants did not submit a reply in support of their Motion for Summary Judgment, they have not responded to this argument.

Langford's notations make clear that she considered Plaintiff's Regular Grievance to be untimely. [*See* Aug. 6, 2020 Grievance, Dkt. No. 31-1 at 25 (mark in box labeled "Expired Filing Period," with adjacent handwritten notation reading "occur 7/1")]. It is less clear whether Langford *also* rejected Plaintiff's Regular Grievance for raising a matter beyond the VDOC's control. [*See id.* (mark in box labeled "Matters beyond the control of the Department of Corrections")]. Johnson, Langford's successor as Grievance Coordinator, posits that Langford "initially noted it was a matter beyond the control of the Department of Corrections and not grievable; however, she marked out that reason and checked that the filing period had expired." [Johnson Aff. ¶ 16]. But it is not apparent how Johnson could have firsthand knowledge of which box Langford "initially noted," or of what Langford intended her notations in the "Intake" section to mean. *See* Fed. R. Civ. P. 56(c)(4) ("An affidavit or declaration . . . must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."). There also is no evidence of any standard practice that Grievance Coordinators use when they check a box by mistake and then wish to cancel that selection. Absent such evidence, Johnson's interpretation of Langford's notes appears to be a matter of opinion. Moreover, even if Johnson's interpretation is accurate, at most Langford canceled only the mark

14

in the "Non-Grievable" box; her "Matters beyond the control of the Department of Corrections" mark was left unaltered. [*See* Aug. 6, 2020 Grievance, Dkt. No. 31-1 at 25].

On the present record, therefore, a reasonable factfinder could conclude that Langford rejected Plaintiff's grievance, at least in part, because it raised a matter beyond the VDOC's control.

It is undisputed that inmates cannot use the Grievance Procedure to complain of issues that lie beyond the VDOC's control. [*See* Johnson Aff. ¶ 5; Operating Procedure 866.1.IV.M.2.d]. Thus, if Plaintiff's Regular Grievance was rejected for raising such an issue, the Grievance Procedure was not "available" to him. It would then follow that Plaintiff's failure to completely exhaust all steps in the Grievance Procedure should not bar this action under 42 U.S.C. § 1997e(a). *See Ross*, 578 U.S. at 642.[8]

As a result, viewing the available evidence in the light most favorable to Plaintiff, the Court finds a genuine dispute of material fact as to whether Plaintiff was required to exhaust the remedies set forth in the Grievance Procedure prior to filing suit. Accordingly, Defendants' Motion for Summary Judgment will be denied.

## V.  Conclusion

For the reasons outlined above, and through an Order that will issue alongside this Memorandum Opinion, Plaintiff's Motion to Strike [Dkt. No. 37] will be **DENIED**, and Defendants' Motion for Summary Judgment [Dkt. No. 30] will be **DENIED without prejudice**.

---

[8] This outcome is not affected by the fact that Langford also marked the "Expired Filing Period" box. If Langford rejected Plaintiff's Regular Grievance for raising an issue beyond the VDOC's control, then Plaintiff was not required to utilize the Grievance Procedure at all. Thus, the subordinate issue of whether he satisfied the Grievance Procedure's timeliness requirements would be rendered moot.

The Court will grant the parties leave to submit further dispositive motions, if appropriate, to address any outstanding issues in this case. All such motions must be filed no later than **forty-five (45) days** following the entry date of the accompanying Order.

Alexandria, Virginia
February 17, 2023

Anthony J. Trenga
Senior U.S. District Judge

16