## IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF VIRGINIA

### Alexandria Division

| | | |
|---|---|---|
| **Wayne Alphonso Thomas, Jr.,** | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **1:21cv1428 (AJT/JFA)** |
| | ) | |
| **Thomas Meyer,** *et al.*, | ) | |
| **Defendants.** | ) | |

### <u>MEMORANDUM OPINION</u>

Plaintiff Wayne Alphonso Thomas, Jr. ("Plaintiff" or "Thomas"), a Virginia inmate proceeding *pro se*, brought this action pursuant to 42 U.S.C. § 1983 alleging violations of his rights while incarcerated at the State Farm Enterprise Unit ("SFEU"), a unit of the Virginia Department of Corrections ("VDOC") by the four named Defendants: Thomas Meyer, Warden; Ross Maurice, Assistant Warden; Dichell Williams, Major of Security; and Desiree Watford, Unit Manager. [Dkt. Nos. 1, 2]. Specifically, Plaintiff alleges the Defendants violated his Eighth Amendment right through their purported deliberate indifference to his safety when his unit was taken off quarantine on June 30, 2020, which then allegedly exposed him to COVID-19 on July 1, 2020. [Dkt. No. 2 at 7, ¶¶ 26-27]. The Defendants filed a Motion for Summary Judgment, asserting that the Complaint should be dismissed because Thomas failed to timely file his administrative grievance. [Dkt. No. 31 at 8-9]. Thomas responded. [Dkt. Nos. 38, 39, 41]. For the following reasons, Plaintiff's Motion for Summary Judgment, Motion to Strike, and Motion to Dismiss that 2nd Summary Judgment, [Dkt. Nos. 58, 66, 81], will be denied, and Defendants' Second MSJ, [Dkt. No. 59], will be granted.

## I. BACKGROUND

### A. Procedural History

On February 17, 2023, the Court found "a genuine dispute of material fact as to whether Plaintiff was required to exhaust the remedies set forth in the Grievance Procedure prior to filing suit." [Dkt. No. 47 at 15]. The dispute of fact existed because while the "notations" made by the intake officer, R. Langford, on the grievance form made it "clear that she considered Plaintiff's Regular Grievance to be untimely," another notation made it "less clear" as to whether Langford "also rejected Plaintiff's Regular Grievance for raising a matter beyond the VDOC's control," which would have rendered the matter not grievable and the Prison Litigation Reform Act's ("PLRA") exhaustion requirement would not bar Thomas' civil action. [*Id.* at 14, 15].[1] The Court denied the Defendants' Motion for Summary Judgment, without prejudice, and granted the parties leave to file dispositive motions.

On March 28, 2023, Plaintiff filed a Motion for Summary Judgment, arguing the Defendants failed to dispute the facts in his Complaint and he is, therefore, entitled to summary judgment. [Dkt. No. 56]. The Defendants filed a Second Motion for Summary Judgment ("Second MSJ") on April 10, 2023, supported by affidavits (including an affidavit from Langford) and exhibits contending they are entitled to summary judgment because Thomas did not exhaust his administrative remedies and also fails on the merits. [Dkt. Nos. 59, 60]. Plaintiff was advised he had the opportunity to file responsive materials pursuant to *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir. 1975), and Local Rule 7(K), to the Second MSJ. [Dkt. Nos. 61, 62]. On May 5, 2023, Thomas also filed a Motion to Strike, with a brief in support. [Dkt. Nos. 66, 67].

---

[1] Langford was not the affiant in support of the motion for summary judgment and therefore on that summary judgment record a fact finder could have concluded that "Langford rejected Plaintiff's grievance, at least in part, because it raised a matter beyond the VDOC's control." [Dkt. No. 47 at 15].

On May 24, 2023, Plaintiff filed a Motion to Compel Discovery, and on June 26, 2023, he filed several pleadings seeking to obtain answers to interrogatories from a non-party, R. Langford, regarding exhaustion, and from Defendant Thomas Meyer regarding the substance of his claim (exposure to and the risk of contracting the COVID-19 virus in 2020). [Dkt. Nos. 69, 70, 72-75] (citing Fed. R. Civ. P. 26 and 33). The Defendants responded and, with respect to the request for the interrogatories directed at Langford, agreed to provide answers to the interrogatories directed to Langford despite the fact that Langford was not a party. [Dkt. No. 76]. By order dated July 14, 2023, the Court dismissed the Motion for Discovery directed at Meyer because it was irrelevant to the dispositive issue of exhaustion. [Dkt. No. 77 at 2]. The July 14, 2023 Order provided Plaintiff leave to file a supplemental brief within twenty-one days of receiving Langford's answers to his interrogatories, which the Defendants provided on or around July 24, 2023. [Dkt. No. 79]. After receiving Langford's answers, Thomas filed a supplemental brief, as well as an essentially identical pleading he styled "Motion to Dismiss that 2nd Summary Judgment." [Dkt. Nos. 80, 81].[2] Plaintiff argues that July 1, 2020, the date he listed on his grievance form as the "Date/Time of Incident," was not the correct date; that Langford erred by using that date in determining that his grievance was not timely filed; Langford is not credible; and that he was unable to exhaust because the grievance remedy was not available. [Dkt. Nos. 80 at 4-5; 81 at 4-5].

---

[2] Plaintiff's "Reply to Langford's Answers to Interrogatories, Arguments in Opposition to Second Summary Judgment" [Dkt. No. 80], and his Motion to Dismiss the 2nd Summary Judgment [Dkt. No. 81] are the same pleading. Each pleading raises the same arguments and Plaintiff has attached the same documents to each.

**B. Undisputed Relevant Facts Regarding Exhaustion[3]**

1. The VDOC Grievance Procedure

VDOC Operating Procedure 866.1 (the "Grievance Procedure" or "VDOC OP 866.1") "is a mechanism for inmates to resolve complaints, appeal administrative decisions and challenge the substance of procedures." [Dkt. No. 31-1 at ¶ 4; *see* VDOC OP 866.1, Dkt. No. 31-1 at 9–22]. "All issues are grievable except those pertaining to policies, procedures and decisions of the Virginia Parole Board, disciplinary hearings, State and Federal court decisions, laws and regulations, and matters beyond the control of the [VDOC]." [Dkt. No. 31-1 at ¶ 5]. "Each facility shall notify each offender upon arrival and during orientation how to access the Offender Grievance Procedure including sources of Informal Complaint, Emergency Grievance, and Regular Grievance forms and directions for submitting each document." [VDOC OP 866.1.IV.A.4].

The Grievance Procedure requires offenders "to resolve their issues informally with facility staff prior to submitting a formal grievance." [*Id.* at 866.1.V.A]. "The offender should demonstrate . . . a good faith effort to resolve their issue informally," which "shall be documented using an Informal Complaint [form], except where operating procedures specifically state that other documentation may be used for the informal process." [*Id.* at 866.1.V.A.1–2]. Responses to Informal Complaints are "made in writing on the Informal Complaint form with reasons for the response stated clearly. The Informal Complaint response should be returned to the office that logged it and the response forwarded to the offender." [*Id.* at 866.1.V.D].

With limited exceptions, a Regular Grievance must "be submitted within 30 calendar days from the date of [the] occurrence/incident or discovery of the occurrence/incident." [*Id.* at

---

[3] The summary judgment record consists of: Dkt. Nos. 2 and 28 (sworn briefs); and Dkt. Nos. 31-1, 36, 39-1, 39-2, 39-3, 39-4; 60-1, 60-2, 80-1 through -4, 81-1 through-4 (affidavits, grievance forms), as well as the responses to Plaintiff's interrogatories [Dkt. No. 79-1], which Plaintiff references and quotes from in his supplemental briefs. [Dkt. No. 80, 81].

866.1.VI.A.1].[4] Thus, "[p]rison staff should respond to the offender's informal complaint within 15 calendar days to ensure that the informal response is provided" before the thirty-day period to file a Regular Grievance expires. [Dkt. No. 31-1 at ¶ 6].

Prison officials conduct an "Intake" review to ensure that a submitted Regular Grievance meets the criteria for acceptance. [VDOC OP 866.1.VI.B.3–4]. If a Regular Grievance fails to meet the criteria for acceptance, prison officials complete the "Intake" section of the Regular Grievance form and return the Grievance to the offender "within two working days from date received." [*Id.* at 866.1.VI.B.4]. "If an offender wishes a review of the intake decision on any grievance, they may send the Regular Grievance form within five calendar days of receipt to the appropriate Regional Ombudsman for a determination . . . . There is no further review or appeal of intake decisions." [*Id.* at 866.1.VI.B.5].

Regular Grievances that pass the intake process have "three possible levels of review." [*Id.* at 866.1.VI.C]. First, "Level I reviews are conducted by the Warden or Superintendent of the prison." [Dkt. No. 31-1 at ¶ 8]. "If the inmate is dissatisfied with the determination, he may appeal the determination to Level II. Level II responses are provided by the Regional Administrator, Health Services Director, Chief of Operations for Offender Management Services or Superintendent for Education." [*Id.*]. "For most issues, Level II is the final level of review. For those issues appealable to Level III, the Deputy Director or Director of the VDOC conducts a review of the regular grievance." [*Id.*].

An offender may file an Emergency Grievance to report "situations or conditions which may subject the offender to immediate risk of serious personal injury or irreparable harm." [VDOC

---

[4] Exceptions to this thirty-day limit include instances "[b]eyond the offender's control" or "[w]here a more restrictive time frame has been established in operating procedures." *Id. at* 866.1.VI.A.1.a–b. Also, "[t]here is no time limit on when an offender may submit a grievance regarding an allegation of sexual abuse." [*Id.* at 866.1.VI.A.1.c].

OP at 866.1.VII.A]. However, the "[s]ubmission of an Emergency Grievance does not satisfy the exhaustion of remedies requirement; the offender must submit the issue on a Regular Grievance if not satisfied with the Emergency Grievance response." [*Id.* at 866.1.IV.O.2.a].

"The exhaustion-of-remedies doctrine requires that procedures established by the [VDOC] must be initiated and followed before an aggrieved party may seek relief from the Courts. After all other available remedies have been exhausted, a lawsuit may be filed." [*Id.* at 866.1.IV.O.1].

> If a Regular Grievance does not meet the criteria for acceptance and review by the Regional Ombudsman does not result in intake into the grievance process, the issue must be resubmitted in accordance with the criteria for acceptance. The exhaustion of remedies requirement will be met only when the Regular Grievance has been accepted into the grievance process and appealed through the highest eligible level without satisfactory resolution of the issue.

[*Id.* at 866.1.IV.O.2.b].

### 2. Plaintiff's Grievance Submissions

On May 25, 2020, the SFEU, where Plaintiff was housed during the times set out in the Complaint, "was placed on lockdown due to suspected contagion of the COVID-19 Virus." [Dkt. No. 2 at ¶ 4]. All offenders were tested, and the lockdown was lifted on May 26, 2020. [*Id.*]. On May 27, 2020, inmate workers were required to return to their assigned positions in Buildings C-3 and C-4. [*Id.* at ¶ 5]. Plaintiff worked in building C-3 and he interacted with inmates from Building C-4 during meals. [*Id.* at ¶ 6]. Plaintiff had contact with persons who tested positive and were placed in lockdown or quarantine. [*Id.* at ¶¶ 7-10].

An inmate collapsed on June 15, 2020 and was "rushed" to the hospital, the SFEU was placed on lockdown, and all SFEU inmates were tested. [*Id.* at ¶ 11]. Approximately two-thirds of the inmates in Building C-3 were infected with COVID-19, but Plaintiff's test was negative. On June 19, 2020, Plaintiff was moved to a cell of an infected offender in Building C-3, and was "quarantined" until the SFEU "reopened." [*Id.* at ¶¶ 11, 12, 25; Dkt. No. 31-1 at 25].

On June 30, 2020, the Defendants, without testing inmates, returned Plaintiff's unit to "normal operations," and Plaintiff started "experiencing symptoms of exposure," which started on "7-1-2020 and [he] was evaluated on 7-5-2020." [Dkt. No. 2 at ¶¶ 13, 26].

On July 5, 2020, Plaintiff submitted an Emergency Grievance seeking medical attention for "coronavirus symptoms" that included headaches, body aches, lack of taste and smell, difficulty breathing, and weakness. [Emergency Grievance No. 405191, Dkt. No. 39-1]. SFEU staff sent a response the following day that found his grievance did not "meet the definition for an emergency" and explained that Plaintiff could "be seen in medical." [*Id.*].Medical personnel evaluated Plaintiff on July 5, 2020. [Dkt. No. 2 at ¶ 26]. Plaintiff's medical records indicate he told medical that he had a temperature and headache, that "onset" of his symptoms was "4 days ago," and had "started after quarantine." [Dkt. No. 2-7].

On July 7, 2020, at 2:33 p.m., Plaintiff submitted a second Emergency Grievance describing COVID-19 symptoms including fatigue, constant headaches, body aches, fever, dizziness, and lack of smell and taste. [Emergency Grievance No. 1298155, Dkt. No. 31-1 at 23]. Plaintiff stated that he had filed an Emergency Grievance two days earlier but still had not received any medical attention. [*Id.*]. SFEU staff responded later on July 7, 2020, indicating again that Plaintiff's Emergency Grievance did not "meet the definition for an emergency," and noted that Plaintiff was "[e]valuated by Medical" at 3:38 p.m. that day. [*Id.*].

On July 14, 2020, Plaintiff was admitted to the infirmary where he remained until he was discharged on July 28, 2020. [Dkt. No. 60-2 at ¶ 8]. On August 3, 2020, Plaintiff submitted Informal Complaint No. PRCC-20-INF-00756 that stated as follows:

> I'm forwarding this Informal Complaint due to the NEGLIGENCE of (S.F.E.U.) Administration causing me to be *exposed* to & catching "COVID-19." On (6-19-20) out of 120 offenders in my housing unit, 80 tested positive for "COVID-19." I'd tested (−) negative, and was moved out of my cell (A34); and placed in (C21)

on C-Tier into the cells of those who tested (+) positive, and was quarantined. On *(7-1-20)* without "RETESTING," my unit was open; and I contracted COVID-19.

[Informal Complaint PRCC-20-INF-00756, Dkt. No. 31-1 at 29] (emphasis added). In the portion of the form labeled "Date/Time of Incident," Plaintiff wrote, "July 1, 2020." [*Id.*].

Defendant Maurice responded to the Informal Complaint on August 5, 2020, and informed Plaintiff that SFEU officials had "followed all CDC and VDH guidelines to reduce the risk of exposure to offenders," such as "the cohorting of offenders, enhanced sanitation practices, mandatory mask wearing and social distancing," and that SFEU had no known active COVID-19 cases at that time, but that if Plaintiff felt symptomatic, he should alert staff. [*Id.*].

On August 6, 2020, Plaintiff submitted a Regular Grievance raising the same facts. [Dkt. No. 31-1 at 24]. In his Regular Grievance, he repeated verbatim the description of events that he had stated in Informal Complaint PRCC-20-INF-00756, which included only two dates: June 19, 2020, and July 1, 2020. [*Id.*]. In the section of the Regular Grievance form labeled "Date/Time of Incident," he again entered, "July 1, 2020." [*Id.*].

Langford was a Grievance Coordinator at SFEU on August 7, 2020. [Dkt. No. 60-1 at ¶ 5]. She received and date stamped Plaintiff's Regular Grievance. [*Id.*]. Langford first reviewed Plaintiff's Regular Grievance to determine if it met the Grievance Procedure's intake criteria. [*Id.* at ¶ 6]. In the "Intake" section of the Regular Grievance, Langford marked a box indicating the grievance was "Non-Grievable" and, on the same line, she marked a different box labeled "Matters beyond the control of the Department of Corrections." [No. 60-1 at ¶ 8]. Langford, however, then sought "guidance" as to whether "these types of COVID-19 complaints were generally grievable," and "learned that it [was] a grievable matter." [*Id.*]. Based upon that guidance, Langford struck through her initial decision (that the issue was non-grievable), initialed that correction, and then continued to review the grievance. [*Id.*].

8

As she reviewed the grievance, Langford determined that it was not timely filed because it was not filed within "30 days from the date of the occurrence/incident." [*Id.* at ¶ 9]. Thomas' grievance was dated August 6, 2020, and he indicated on the form in the space designated "Date/Time of Incident" that the date was "July 1, 2020." [*Id.* at ¶ 10]. Because the Regular Grievance was filed beyond the 30-day time period for filing a Regular Grievance, Langford checked the box for expired filing period. [*Id.* at ¶ 10].

The "only reason" Langford rejected Plaintiff's Regular Grievance during the intake process was because the grievance had not been filed with the 30-day time limit for submitting the Regular Grievance. [*Id.* at ¶ 11]. Had Plaintiff's Regular Grievance been filed within the 30-day time period, Langford would have accepted it as grievable because the grievance complained about a grievable matter. [*Id.* at ¶ 13].

Plaintiff appealed the intake decision to the Regional Ombudsman[5] in a letter dated August 9, 2020, which was stamped as received on August 13, 2020. [Dkt. No. 39-3 at 3]. The body of Plaintiff's appeal letter stated, in its entirety:

> I'd tested (−) negative on (6-19-20), where I was moved from (C3 A34) to (C3 C21) and was quarantined there until ★(7-1-20); the day which this institution was "reopen without testing" after such a severe outbreak. ★(I did not receive my "COVID-19" test results until:<7-13-20>, were I was placed in Powhatan Medical Unit for [14] days, and was (retested) twice before being released.) Also this matter is neither beyond the control of "State Farm Enterprise Unit/D.O.C." due to the fact that this administration showed (Negligence) by KNOWING that I'd already tested (−Negative) before them reopening my housing unit, and failing to retest; thereby exposing me to "catching the CORONAVIRUS."

---

[5] Plaintiff's assertion in his affidavit that he filed his appeal with "the Level II responder" is incorrect and disproved by the records he cites, Dkt. No. 31-1 at 25. [Dkt. Nos. 39 at 5; 36 at 2]. As is clear from VDOC OP 866.1.VI.B.5, an appeal to the Regional Ombudsman when a grievance is rejected for intake is an entirely different procedure than a Level II review, which is available *only* if a grievance is accepted for intake. *Id.* at 866.1.VI.C. When a grievance is rejected for intake—as Plaintiff's was—it cannot proceed to Level I review, let alone Level II review.

[*Id.*] (emphasis, spelling, and punctuation unchanged from original). The Regional Ombudsman upheld Langford's intake decision. [Dkt. No. 31-1 at 25].

## II. LEGAL STANDARD

Summary judgment is appropriate only when the Court, viewing the record as a whole and in the light most favorable to the nonmoving party, finds that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Tolan v. Cotton*, 572 U.S. 650, 655–57 (2014); *Scott v. Harris*, 550 U.S. 372, 380 (2007). A fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A factual dispute is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The moving party bears the initial burden to demonstrate the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the movant carries this burden, the nonmovant must present specific facts that demonstrate a genuine dispute for trial, not "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials," or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). A verified complaint, whether operative or superseded, serves as "the equivalent of an opposing affidavit for summary judgment purposes, when the allegations contained therein

are based on personal knowledge." *Goodman v. Diggs*, 986 F.3d 493, 498 (4th Cir. 2021) (internal quotation marks omitted).

"Although the court must draw all justifiable inferences in favor of the nonmoving party, the nonmoving party must rely on more than conclusory allegations, mere speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence." *Dash v. Mayweather*, 731 F.3d 303, 311 (4th Cir. 2013). Rather, there must be enough evidence to enable a reasonable factfinder to return a verdict for the nonmoving party. *Anderson*, 477 U.S. at 252. Moreover, "at the summary judgment stage the judge's function is not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. The critical inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52.

"When cross-motions for summary judgment are before a court, the court examines each motion separately, employing the familiar standard under Rule 56 of the Federal Rules of Civil Procedure." *Desmond v. PNGI Charles Town Gaming, LLC*, 630 F.3d 351, 354 (4th Cir. 2011). (4th Cir. 1991)). "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and we think it should be interpreted in a way that allows it to accomplish this purpose." *Celotex v. Catrett*, 477 U.S. 317, 323-24 (1986). As the Fourth Circuit has noted, summary judgment allows courts "to avoid useless trials where material facts are not disputed and the law points unerringly to the conclusion that one of the parties is entitled to judgment as a matter of law." *Utility Control Corp. v. Prince William Constr. Co.*, 558 F.2d 716, 719 (4th Cir. 1977). It allows courts "to avoid a useless trial" and "make[s] possible the

prompt disposition of controversies on their merits without a trial, if in essence there is no real dispute as to the salient facts." *Bland v. Norfolk & S.R. Co.*, 406 F.2d 863, 866 (4th Cir. 1969).

In furtherance of the aims of summary judgment, this Court adopted Local Civil Rule 56(B), which requires a movant to include a statement of undisputed facts.

> (B) Summary Judgment—Listing of Undisputed Facts: *Each brief in support of a motion for summary judgment shall include a specifically captioned section listing all material facts as to which the moving party contends there is no genuine issue and citing the parts of the record relied on to support the listed facts as alleged to be undisputed.* A brief in response to such a motion shall include a specifically captioned section listing all material facts as to which it is contended that there exists a genuine issue necessary to be litigated and citing the parts of the record relied on to support the facts alleged to be in dispute. In determining a motion for summary judgment, the Court may assume that facts identified by the moving party in its listing of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion.

(emphasis added).

> Local Rule 56(B) serves two salutary purposes. It notifies non-moving parties of the facts that the movant contends are undisputed and support the movant's alleged entitlement to judgment as a matter of law, and it provides the Court with an organized analytical framework to assess whether any material factual dispute exists and whether the movant is entitled to the relief sought. A party that ignores Local Rule 56(B) undermines those dual purposes and impedes the Court's ability to fairly and expeditiously resolve a motion for summary judgment . . . . A movant's compliance with Local Rule 56(B) is critical for a court—and opposing parties—to assess the merits of the movant's summary judgment motion.

*Certusview Techs., LLC v. S&N Locating Servs., LLC*, No. 2:13-cv-346, 2015 U.S. Dist. LEXIS 103982, *14-15 (E.D. Va. Aug. 7, 2015).

## III. ANALYSIS

### A. Plaintiff's Motion for Summary Judgment

Plaintiff's Motion for Summary Judgment was filed without a brief in support, does not list the alleged undisputed facts, and simply asserts that the allegations in his Complaint have "not been disputed in any manner and must be accepted as true." [Dkt. No. 56 at 1]. The Defendants argue Plaintiff has not complied with Local Rule 56(B); that Plaintiff's allegations have been

disputed; and the Defendants provide a summary, citing to the record, indicating where they had previously denied Plaintiff's allegations. [Dkt. No. 62 at 2].[6] Despite being alerted to his noncompliance, and being granted an extension of time to respond, Plaintiff did not cure his deficient Motion for Summary Judgment. If his brief in support of his Motion, filed on May 5, 2023 was an attempt to do so, Plaintiff failed because that pleading simply references a memorandum he filed in support of his original complaint and his affidavits asserting he had exhausted his claim, citing Rule 56(c)(1)(A).[7] [Dkt. No. 67 at 4] (referencing Dkt. No. 2, 24 and 36). Plaintiff's reliance on Rule 56(c)(1)(A) is misplaced because compliance with Local Civil Rule 56(B) requires that he link his undisputed facts to specific facts in the record.[8]

---

[6] The record establishes that the Defendants disputed the allegations of fact in the Complaint. The Defendants' Answer admitted that the Plaintiff was an inmate housed by the VDOC at the SFEU during the relevant time period and that the Defendants were correctional employees at the SFEU during the relevant time periods. [Dkt. No. 19 at ¶ 2]. The Answer also expressly denied that Plaintiff had exhausted his administrative remedies. [*Id.* at ¶ 3]. The Answer further asserted that "reasonable measures were taken to try and mitigate and contain the spread of the Covid-19 virus in the" SFEU; denied "they were deliberately indifferent to Plaintiff's risk of contracting Covid-19 while he was incarcerated" at the SFEU; and denied "that their actions caused Plaintiff to become infected with Covid-19." [*Id.* at ¶ 4]. The Defendants also denied the remaining allegations of the Complaint. [*Id.*]. Plaintiff's argument is frivolous.

[7] Thomas includes a section in his brief labeled "Undisputed Facts and Arguments in Support" but that section of his brief does not provide specific references to the record. [Dkt. No. 67 at 4-6]. While the brief references Dkt. Nos. 1, 2, 24, and 36 [Dkt. No. 67 at 2], it does not provide a specific reference within the docket entries. The Complaint, Dkt. No. 1, contains no facts; the Memorandum in Support, Dkt. No. 2 is a sworn 8-page pleading, with 30 numbered paragraphs, to which Plaintiff attached 9 exhibits totaling 23 pages; Dkt. No. 24 is a 2-page discovery motion accompanied by a 2-page affidavit; and Dkt. No. 36 is a 2-page affidavit. The only specific citation to the record in the brief is to the fact that an offender passed out [Dkt. No. 67 at 5] (citing Dkt. No. 2-4), which is not material to the issue of exhaustion. The brief does not provide any specific citation to the record to dispute any of the undisputed facts set out by the Defendants in their Second MSJ. *See Carlson v. Boston Sci. Corp.*, 856 F.3d 320, 325 (4th Cir. 2017) ("The responsibility to comb through the record in search of facts relevant to summary judgment falls on the parties—not the court."); *Malina v. Baltimore Gas & Elec. Co.*, 18 F. Supp. 2d 596, 604 (D. Md. 1998) ("[I]t is the responsibility of the plaintiff, not the court, to identify with particularity the evidentiary facts existing in the record which can oppose the defendant's summary judgment motion. The court . . . is not required to independently comb the record to look for them."); *see also Kalola v. Int'l Bus. Machines Corp.*, No. 13-cv-7339, 2017 U.S. Dist. LEXIS 220765, at *12 (S.D.N.Y. Jan. 9, 2017) ("Plaintiff cannot expect the Court to comb the record to find evidence not highlighted in [Plaintiff's] motion papers—summary judgment is not a game of hide and seek.") (citation omitted).

[8] Plaintiff's prior pleadings demonstrate that he knows how to link an assertion based upon a matter in the record by referencing another docket entry. In addition to the example previously cited, *supra* note 3, Thomas' September 6, 2022 affidavit states the he "filed 'Two Emergency Grievances' that were directly related to the claims presented in my complaint and if the court reviews Document 31-1 (Page ID#162), which is Emergency Grievance #1298155, the date is 7-7-2020." [Dkt No. 36 at 1]; *see also* Dkt. No. 38 (Plaintiff's Memorandum in Support in re Motion to Strike Motion for Summary Judgment).

In commenting on a similar local rule, the Second Circuit stated that the "purpose of [the local rule] is to streamline the consideration of summary judgment motions by freeing district courts from the need to hunt through voluminous records without guidance from the parties." *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 74 (2d Cir. 2001). The requirement of a list of undisputed facts narrows the litigation because the party opposing a motion for summary judgment must "specifically respond to the assertion of *each* purported undisputed fact . . . and, if controverting any such fact, [must] support its position by citing to admissible evidence in the record." *Baity v. Kralik*, 51 F. Supp. 3d 414, 418 (S.D.N.Y. 2014) (emphasis added) (quoting *Risco v. McHugh*, 868 F. Supp.2d 75, 86 n.2 (S.D.N.Y. 2012)). Rule 56(c)(1)(A) states that "[a] party asserting that a fact cannot be or is genuinely disputed *must* support the assertion by . . . (A) citing *to particular parts of materials in the record*, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." (emphasis added); *see Carlson*, 856 F.3d at 325 ("The responsibility to comb through the record in search of facts relevant to summary judgment falls on the parties—not the court."); *Malina*, 18 F. Supp.2d at 604 ("[I]t is the responsibility of the plaintiff, not the court, to identify with particularity the evidentiary facts existing in the record which can oppose the defendant's summary judgment motion. The court ... is not required to independently comb the record to look for them."). Here, Plaintiff's reference to Rule 56(c)(1)(A) simply serves to highlight his failure to comply with Local Civil Rule 56(B), which frustrates the purpose of providing a list of undisputed facts to "assist the Court [in] narrowing the scope of the issues to be adjudicated and identifying the facts relevant and admissible to that determination." *Baity*, 51 F. Supp. 3d at 418.

In summary, Plaintiff argues that he is entitled to summary judgment based upon his assertion that the facts alleged in his Complaint have not been disputed. [Dkt. No. 56 at 1]. As

noted above, this argument has no merit given Defendants submitted a detailed affidavit contesting the merits of Plaintiff's claim. Therefore, Plaintiff's Motion for Summary Judgment will be denied.

**B. Defendants' Second MSJ**

Defendants argue that they are entitled to summary judgment because Plaintiff failed to exhaust all available administrative remedies before filing suit, as required by the PLRA; that they were not deliberately indifferent to the risk of exposure to COVID-19; and they are entitled to qualified immunity. [Dkt. No. 60 at 10–11]. The summary judgment record establishes that Plaintiff's grievance was not timely filed.

Defendants' Second MSJ sets forth a statement of undisputed facts and Plaintiff failed to submit statements of undisputed and disputed facts in his "Objection" to Defendants' Second MSJ. [Dkt. No. 8]. Plaintiff's failure to file a statement of undisputed and disputed facts renders the Defendants' facts admitted. *Gholson v. Murray*, 953 F. Supp. 709, 714 (E.D. Va. 1997) (noting courts assume uncontroverted facts in a movant's motion for summary judgment as admitted); *see also JDS Uniphase Corp. v. Jennings*, 473 F. Supp. 2d 705, 707 (E.D. Va. 2007) (holding a movant's statement of undisputed facts is deemed admitted where nonmovant's response fails to "identify with any specificity which facts, if any, were disputed") (citing E.D. Va. Loc. Civ. R. 56(B)).[9] Accordingly, the material undisputed facts set forth above are based upon the Defendants' affidavits and exhibits, and other relevant sworn matters.

In relevant part, the PLRA provides: "No action shall be brought with respect to prison conditions under [42 U.S.C. § 1983] or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). Because the exhaustion of administrative remedies is an

---

[9] In pertinent part, Local Rule 56(B) that "the Court may assume that facts identified by the moving party in its listing of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion." E.D. Va. Loc. Civ. R. 56(B).

affirmative defense, a defendant bears the burden of proving lack of exhaustion. *See Jones v. Bock*, 549 U.S. 199, 212, 216 (2007); *Moore v. Bennette*, 517 F.3d 717, 725 (4th Cir. 2008). Nevertheless, "exhaustion in cases covered by § 1997e(a) is mandatory," and district courts have no discretion to waive this requirement. *Porter v. Nussle*, 534 U.S. 516, 524 (2002).

Under the PLRA, exhaustion "requires proper exhaustion," *Woodford v. Ngo*, 548 U.S. 81, 93 (2006) (emphasis added), meaning that the plaintiff must "us[e] all steps that the agency holds out, and do[] so properly (so that the agency addresses the issues on the merits)." 548 U.S. at 90 (quoting *Pozo v. McCaughtry*, 286 F.3d 1022, 1024 (7th Cir. 2002) (emphasis in original)). In so holding, *Woodford* reasoned that "proper exhaustion" enhances "the quality of those prisoner suits that are eventually filed," for, "[w]hen a grievance is filed shortly after the event giving rise to the grievance, witnesses can be identified and questioned while memories are still fresh, and evidence can be gathered and preserved." *Id.* at 95. Thus, "proper exhaustion" requires "compliance with an agency's deadlines and other critical procedural rules because no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings." *Id.* at 90-91. These "critical procedural rules" specifically include grievance timing requirements, otherwise, "a prisoner wishing to bypass available administrative remedies could simply file a late grievance without providing any reason for failing to file on time," and, following rejection of the grievance as untimely, "proceed directly to federal court." *Id.* at 95.[10] The PLRA was not intended to "create such a toothless scheme." *Id.* The PLRA's exhaustion-prior-to-filing requirement is

---

[10] The PLRA requires that an inmate "must 'complete the administrative review process in accordance with the applicable procedural rules.'" *Jones*, 549 U.S. at 218 (quoting *Woodford*, 548 U.S. at 88). Those rules "are defined not by the PLRA, but by the prison grievance process itself," and thus "it is the prison's requirements . . . that define the boundaries of proper exhaustion." *Id.* Accordingly, the VDOC's Grievance Procedure establishes the applicable rules for Plaintiff to properly exhaust his § 1983 claims prior to bringing suit. VDOC OP 866.1.IV.O.1. Pursuant to the Grievance Procedure, Plaintiff was required to (i) file a Regular Grievance that was accepted for intake, and then (ii) appeal that Regular Grievance through all eligible levels of review without satisfactory resolution, before raising those claims in court. VDOC OP 866.1.IV.O.2.b.

"mandatory" and the language of the PLRA is "unambiguous." *Ross v. Blake*, 578 U.S. 632, 638 (2016). "An inmate 'shall' bring 'no action' . . . 'absent exhaustion of available administrative remedies.'" *Id.* (quoting *Woodford*, 548 U.S. at 85) (additional citations omitted)).[11]

In an attempt to discredit Langford's affidavit, he has moved to strike her affidavit, reasserts his frivolous *res judicata* argument, and argues she erred in determining July 1, 2020 was the date of the incident.[12] Plaintiff points to what he refers to as the "several reasons denoted on the decisions to deny intake" of his Regular Grievance as a basis for his assertion that the two sets of notations by Langford on the grievance form create a genuine dispute of material fact and therefore the Defendants are not entitled to summary judgment. [Dkt. Nos. 39 at 7; 81 at 6-7]. While the plausible interpretation of the notations created a question of material fact and was the Court's basis for the denial of the First Motion for Summary Judgment on February 17, 2023, the summary judgment record now contains Langford's affidavit, which clarifies that the Langford's only reason for refusing the grievance was because it was untimely. Further, her affidavit

---

[11] To the extent Plaintiff argues his grievance was timely because he filed two emergency grievances, the emergency grievances are irrelevant to the issue of exhaustion, as the VDOC's Grievance Procedure explicitly states that the "[s]ubmission of an Emergency Grievance does not satisfy the exhaustion of remedies requirement." VDOC OP 866.1.IV.O.2.a. Plaintiff cites *Downey v. Pennsylvania Department of Corrections*, 968 F.3d 299 (3d Cir. 2020), for the opposite proposition, that submitting an emergency grievance alone satisfies the PLRA's exhaustion requirement. [Dkt. No. 39 at 7]. But the ruling in *Downey* hinged on Pennsylvania prison grievance procedures that are plainly inapplicable here. *See Downey*, 968 F.3d at 305–07.

[12] Plaintiff reiterates his meritless *res judicata* argument that the Court "resolved" the exhaustion issue in the February 17, 2023 Memorandum Opinion; questioned Langford's credibility; argues the record does not indicate upon what basis his appealed was denied; and that Plaintiff "caught" COVID-19 on the date he was diagnosed (July 13, 2020), and not when he was exposed. [Dkt. No. 68 at 2-4]. Plaintiff's complaint alleges that that although he had tested negative and had been placed in quarantine through June 20, 2020, the defendants were deliberately indifferent to his health and safety by "opening" his unit "[o]n 6-30-2020 . . . without testing . . . [and that his] symptoms started on 7-1-2020." *See* Dkt. No. 2 at 7; *see also* Dkt. No. 24-1 at 2 (Plaintiff was "released from quarantine (July 1, 2020)," which exposed Plaintiff because he was placed "back in a Largely [COVID-19] Contaminated Environment"); Dkt. No. 36 (July 1, 2020 "was the date my unit was released for off of Quarantine"). Plaintiff also appealed the determination that his grievance was untimely arguing that he was timely and his grievance was grievable. Langford's affidavit establishes that the matter was grievable and the only sensible interpretation, supported by this record, is that the appeal affirmed the refusal of the grievance because it was untimely.

establishes that if the grievance had been timely filed she would have accepted it as grievable because it complained about a grievable matter. [Dkt. 60-1 at ¶ 13].[13]

In his response to Langford's answers to his interrogatories, and in his essentially identical Motion to Dismiss the Second Motion for Summary Judgment, Thomas argues that Langford's affidavit is incredible because three years have passed since she denied the grievance and she no longer has any records and that her intent in finding his grievance "untimely" was "to prevent intake and obstruct exhaustion of this viable claim against her employers." [Dkt. Nos. 80 at 3, 6; 81 at 3, 6]. As this Court has previously held, without evidence of an affiant's lack of credibility, an assertion that an affiant has lied is insufficient.

> This bald contention is insufficient, for a copyright plaintiff cannot base her opposition to summary judgment "entirely on the hope that a fact finder will disbelieve the persons who have submitted affidavits" on issues of access. *Vantage Point, Inc. v. Parker Bros., Inc.*, 529 F. Supp. 1204, 1213 (E.D.N.Y. 1981), *aff'd*, 697 F.2d 301 (2d Cir. 1982) (table). Put another way, it is axiomatic that "a party may not defeat a properly supported motion for summary judgment merely by raising generalized questions as to the credibility of the movant's affiants." *Robinson v. Cheney*, 277 U.S. App. D.C. 393, 876 F.2d 152, 162 (D.C. Cir. 1989); *see also Moreau v. Local Union No. 247, It'l Broth. Of Firemen and Oilers*, AFL-CIO, 851 F.2d 516, 519 (1st Cir. 1988).

*Eaton v. NBC*, 972 F. Supp. 1019, 1024 (E.D. Va. 1997), *aff'd*, 145 F.3d 1324, 1998 U.S. App. LEXIS 10288 (4th Cir. 1998) (per curiam); *see also Miccosukee Tribe of Indians v. United States*, 980 F. Supp. 448, 452 (S.D. Fla. 1997) ("A party opposing summary judgment must rely on more than vague assertions that additional discovery will produce needed, but unspecified facts. Granting summary judgment on the basis of affidavits is proper under Federal Rule of Civil Procedure 56. A party may not defeat a properly supported summary judgment motion by raising general questions about an opponent's affidavits.") (citing *Robinson*, 876 F.2d at 162; *Barfield v.*

---

[13] Langford's affidavit was the basis upon which Thomas sought and was granted leave to serve interrogatories on Langford, a non-party.

*Brierton*, 883 F.2d 923, 931 (11th Cir. 1989)). "A motion for summary judgment cannot be defeated merely by an opposing party's incantation of lack of credibility over a movant's supporting affidavit." *Trans-Aire International, Inc. v. Northern Adhesive Co.*, 882 F.2d 1254, 1257 (7h Cir. 1989) (citation omitted). "When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita,* 475 U.S. at 586.

Plaintiff next asserts a similar argument—that Langford erred in finding the date of the incident was July 1, 2020, instead of July 8, 2020 or July 13, 2020. [Dkt. Nos. 80 at 5; 81-4 at 1-2; 81 at 5; 81-4 at 1-2]. Langford's affidavits, as well as her answers to the interrogatories, explained how she arrived at her decision and Plaintiff has produced no evidence to establish that determination was erroneous. Plaintiff's argument is inconsistent with his informal complaint, grievance, and his Complaint in this matter. Plaintiff argues Langford failed to consider the July 8, 2020 or the July 13, 2020 dates, but he fails to note that the only two dates in his informal complaint or regular grievance were June 19, 2020 and July 1, 2020. [Dkt. Nos. 80-1 at 1, 3; 81-1 at 1, 3]. Plaintiff's argument is premised upon matters not included in either the informal complaint or the grievance.

In addition, although Plaintiff admits he entered July 1, 2020 on his informal complaint and his grievance,[14] he does not address the context of that date in the body of the text where he asserts that the Defendants (referred to as the "SFEU Administration") "caus[ed] [him] to be

---

[14] In the answers to Plaintiff's interrogatories, Langford explained that for intake purposes if the date provided by the inmate on the grievance form "indicate[d] that the filing period had expired" she would then "look to the body of the regular grievance and written complaint, or any documents attached, to see if [she] could identify a date that would have allowed the regular grievance to be accepted for intake." [Dkt. No. 79-1 at 1]. Plaintiff notes this response in his supplemental briefs [Dkt. Nos. 80 at 5; 81 at 5], but ignores the fact that his Complaint and grievance, which complain about his being *exposed* to COVID-19 by the defendants, establish that his exposure occurred on July 1, 2020 after the quarantine was lifted on June 30, 2020.

19

*exposed* to [and] catch[] COVID-19" when Defendants ended the quarantine on June 30, 2020. [*Id.*]. It was the end of the quarantine that Thomas blames for his being *exposed* to COVID-19 on July 1, 2020 because after the end of the quarantine on June 30, 2020 he was forced to interact with COVID-19 positive inmates. [Dkt. Nos. 81-1 at 1, 3]. To be sure, the response to the informal complaint, which accompanied the grievance, responded to his concern about being *exposed*:

> We have followed all CDC and VDH guidelines to reduce the *risk of exposure* to offenders. This includes but are [sic] not limited to the cohorting of offender, enhanced sanitation practices, mandatory mask wearing and social distancing. At this time there are no known active cases at SFEU, please continue to do your part to help *minimize the potential exposure* to staff and offenders alike. If you feel symptomatic, PLEASE make sure staff are aware so you can be seen by medical.

[Dkt. Nos. 80 at 3; 81 at 3] (emphasis added).[15] The grievance concerned Thomas's *exposure* and had nothing to do with the subsequent testing that Thomas raises only after his grievance was determined to be untimely—the subsequent testing was not mentioned in the either the informal complaint or grievance upon which Langford made her determination the grievance was untimely.[16] In his appeal of the denial of the grievance as untimely, Thomas raised for the first time that he did not receive his test results on July 13, 2020. His appeal continued and again noted that he was *exposed* on July 1, 2020—after Defendants lifted the quarantine on June 30, 2020, which is what "expos[ed] [Thomas] to catching CORONAVIRUS." [Dkt. No. 39-3 at3].

---

[15] In his Memorandum, as noted in the Statement of Undisputed Facts, *supra* at 11, Plaintiff averred that on June 30, 2020, the defendants, without testing inmates, returned Plaintiff's unit to "normal operations," and Plaintiff started "experiencing symptoms of exposure," which started on "7-1-2020 and [he] was evaluated on 7-5-2020." [Dkt. No. 2 at ¶¶ 13, 26]. The summary of the informal complaint entered into VDOC's tracking system describes Thomas' complaint as "Offender states he contracted COVID-19 because he was moved to a pod with people who were positive." [Dkt. No. 60-1 at 7]. Langford and Defendant Maurice's interpretation of the informal complaint and grievance as complaining about exposure to COVID-19 is entirely consistent with Plaintiff's Eighth Amendment claim in this Court, which is premised upon his exposure to dangerous conditions (inmates and staff infected with COVID-19) on July 1, 2020 after the lockdown was lifted on June 30, 2020.

[16] When he was evaluated by medical personnel on July 5, 2020, the medical records Plaintiff submitted in support of his complaint indicate that Plaintiff stated he had a temperature and headache, that "onset" of his symptoms was "4 days ago," and that the symptoms "started after quarantine." [Dkt. Nos. 2 at ¶ 26; 2-7]. Plaintiff's exhibits, therefore, also indicate that the exposure at issue occurred on July 1, 2020.

Plaintiff's argument that the administrative remedies were not available, *see Ross*, 578 U.S. at 642 ( "[a]n inmate . . . must exhaust available remedies, [he] need not exhaust unavailable ones"), has no merit. Although the PLRA does not define the term "available," "courts have generally afforded it its common meaning; thus, an administrative remedy is not considered to have been available if a prisoner, through no fault of his own, was prevented from availing himself of it." *Moore*, 517 F.3d at 725.

*Ross* recognized three instances where an administrative remedy may become "unavailable" for the purposes of the PLRA, such that the untimely filing of a grievance would not amount to a prisoner failing to exhaust his or her administrative remedies. First, "an administrative remedy is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates." *Id.* Second, an administrative remedy is unavailable when the "administrative scheme [is] so opaque that it becomes, practically speaking, incapable of use." *Id.* Finally, an administrative remedy is unavailable "when prison administrators' thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 644. The Fourth Circuit held that "a grievance process is rendered 'unavailable' under the PLRA only if an inmate actually is prevented from using it." *Moss v. Harwood*, 19 F.4th 614, 623 (4th Cir. 2021).

Plaintiff does not argue that the VDOC grievance system is a dead end—to the contrary, Defendants' evidence establishes that if he had filed his grievance within the thirty-day period the grievance would have been accepted. He also does not argue the grievance system is opaque and, again, the record establishes Thomas was able to file emergency grievances, informal complaints, and his grievance. Thomas simply failed to file his grievance in a timely manner. His argument

appears to be that Langford thwarted his attempt to grieve by intentionally denying his grievance as untimely "to prevent intake and obstruct exhaustion of this viable claim against her employers." [Dkt. Nos. 80 at 3, 6;  81 at 3, 6]. His argument is nothing more than speculation and is not only not supported by the summary judgment record, but Langford has averred that if Plaintiff had timely submitted the grievance it would have been accepted. Further, during the first half of July, Thomas was able to submit two emergency grievances (July 5, 2020 and July 7, 2020) without any difficulty. *See Moss*, 19 F.4th at 623 (affirming grant of summary judgment where the record demonstrated that the plaintiff was able to participate in the grievance process and in fact "submit[ed] multiple grievances"). The emergency grievances, although not part of the required PLRA exhaustion, establish that Thomas was clearly capable of filing grievances regarding his exposure to COVID-19 during July 2020. And the unambiguous language of the PLRA "means a court may not excuse a failure to exhaust." <u>Ross</u>, 586 U. S. at 639. Here, the undisputed facts establish that the grievance remedy was readily available to Thomas and he simply failed to take advantage of it in a timely manner. Thus, Defendants' Motion for Summary Judgment will be granted.[17]

### D. Plaintiff's Motion to Strike

Plaintiff also seeks to have the Defendants' Second MSJ stricken under Federal Rule of Civil Procedure 12(f), arguing that the Second MSJ is "piecemeal litigation" because it could have been raised earlier and the defense of exhaustion is barred by the doctrine of *res judicata* because the Court denied the first Motion for Summary Judgment. [Dkt. No. 66 at 2]. Rule 12(f) authorizes a court to "strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). As an initial matter, a motion for summary judgment

---

[17] For the same reasons, Plaintiff's Motion to Dismiss the 2nd Summary Judgment [Dkt. No. 81] will be denied.

is not a "pleading," See Fed. R. Civ. P. 7(a) (listing types of pleadings), and therefore Rule 12(f) does not apply. However, although Plaintiff's Motion is outside the scope of Rule 12(f), a district court has inherent power, in appropriate circumstances, "to strike items from the docket as a sanction for litigation conduct." *Ready Transp., Inc. v. AAR Mfg., Inc.*, 627 F.3d 402, 404 (9th Cir. 2010); *see also Iota Xi Chapter of Sigma Chi Fraternity v. Patterson*, 566 F.3d 138, 150 (4th Cir. 2009) (upholding, as "an appropriate sanction," an order striking surplus pages of filing that exceeded page limitation). But this is not such a circumstance.

Here, Plaintiff's reliance on the doctrine of *res judicata* is misplaced because the Court's February 17, 2023 Memorandum Opinion was not a judgment on the merits—indeed, it expressly noted the dismissal was without prejudice. *See Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 396 (1990) (explaining a dismissal without prejudice "does not operate as an adjudication upon the merits, and thus does not have a *res judicata* effect" (alteration, citation, and internal quotation marks omitted)); *Lynk v. LaPorte Superior Court No. 2*, 789 F.2d 554, 566 (7th Cir. 1984) ("by definition," neither *res judicata* nor collateral estoppel arise from a dismissal without prejudice).[18] Therefore, the Motion to Strike will be denied.

---

[18] The requirements for the application of *res judicata* are "(1) The first suit must have concluded in a final judgment on the merits; (2) The second suit must involve the assertion of claims by persons who were parties or in privity with parties in the first suit; and (3) The claims asserted in the second suit must be based on the same cause of action as the first suit." *Kenny v. Quigg*, 820 F.2d 665, 669 (4th Cir. 1987). Here, there is no prior suit, and hence no final judgment on the merits. The February 17, 2023 Memorandum Opinion noted that the notations on the grievance form made "clear that [Langford] considered Plaintiff's Regular Grievance to be untimely. [Aug. 6, 2020 Grievance, Dkt. No. 31-1 at 25 (mark in box labeled 'Expired Filing Period,' with adjacent handwritten notation reading 'occur 7/1')]," but it was "less clear whether Langford also rejected Plaintiff's Regular Grievance for raising a matter beyond the VDOC's control. [See id. (mark in box labeled 'Matters beyond the control of the Department of Corrections')]." [Dkt. No. 47 at 14].

The similar doctrine of collateral estoppel has not been argued, but it only applies if the proponent demonstrates that:

> (1) the issue or fact is identical to the one previously litigated; (2) the issue or fact was actually resolved in the prior proceeding; (3) the issue or fact was critical and necessary to the judgment in the prior proceeding; (4) the judgment in the prior proceeding is final and valid; and (5) the party to be foreclosed by the prior resolution of the issue or fact had a full and fair opportunity to litigate the issue or fact in the prior proceeding.

## IV. CONCLUSION

For the reasons outlined above, and through an Order that will issue alongside this Memorandum Opinion, Plaintiff's Motion to Strike [Dkt. No. 66], his Motion for Summary Judgment [Dkt. No. 56], and his Motion to Dismiss Defendants' Second Motion for Summary Judgement [Dkt. No. 81] will each be DENIED; and Defendants' Second Motion for Summary Judgment [Dkt. No. 59] will be GRANTED.

September 21, 2023
Alexandria, Virginia

_____
Anthony J. Trenga
Senior U.S. District Judge

---

*In re Microsoft Corp. Antitrust Litig.*, 355 F.3d 322, 326 (4th Cir. 2004). The February 17, 2023 Memorandum Opinion was not a judgment on the merits and, as noted above, did not resolve the issue of exhaustion as demonstrated by the fact that the Motion for Summary Judgment was dismissed without prejudice.